UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

       Plaintiff,

                                     File No. 1:12-cr-132
v.
                                     HON. JANET T. NEFF

DAVID CASILLAS,

       Defendant.

_____/

## **O P I N I O N**

Before the Court is a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255, filed by Defendant David Casillas (ECF No. 1833). The Government has filed a response to the motion (ECF No. 1849). For the reasons herein, the motion will be denied.

### I. Background

In February 2013, the Government charged Defendant and 30 other members of a group called the Holland Latin Kings (HLK) with conspiring to participate in a criminal enterprise. In July 2013, the Government filed a superseding indictment naming Defendant in the following counts: Count One, participation in a racketeering conspiracy, 18 U.S.C. § 1962(d), and Count Fourteen, conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine, 21 U.S.C. §§ 841(a), 841(b)(1)(A)(ii), 846. (Fourth Superseding Indictment, ECF No. 480.)

In June 2014, the Honorable Robert Holmes Bell presided over a 10-day jury trial on the charges against Defendant and a co-defendant, Antonio Rios. At the end of the trial, the jury returned a verdict finding Defendant guilty of Counts One and Fourteen. (Verdict, ECF No.

1197.)  The jury also found Rios guilty of the same counts, but acquitted him of a separate charge for conspiracy with intent to distribute and to distribute marijuana, as well as a charge of assault with intent to commit murder.  (*Id.*)

Prior to sentencing, the probation officer prepared a Presentence Investigation Report (PIR) scoring Defendant with an adjusted offense level of 43 and a criminal history category of III, resulting in a guideline sentencing range of life in prison, subject to the statutory maximum punishments for Counts One (20 years) and Fourteen (life).  (PIR, ECF No. 1369, PageID.20506.)  Defendant's attorney filed several objections to the PIR and asked for a downward departure from the guidelines.

Judge Bell granted Defendant's objections, in part.  Using an adjusted offense level of 41 and a criminal history category of III, Judge Bell sentenced Defendant to 200 months of imprisonment for Count One and 360 months for Count Fourteen, but gave Defendant credit of 148 months for "gang-related discharged terms of imprisonment," resulting in a total term of 212 months.  (J., ECF No. 1397.)

Defendant appealed his conviction and sentence, raising a number of issues. However, the Court of Appeals rejected his arguments and affirmed his conviction and sentence. *United States v. Rios*, 830 F.3d 403 (6th Cir. 2016).  He subsequently filed a petition for a writ of certiorari which was denied by the Supreme Court.

Defendant now raises the following issues in his motion under § 2255:

I.      [Defendant's] conviction must be vacated based on the deprivation of his right to an impartial jury.

II.     18 U.S.C. § 1962(d) and 21 U.S.C. § 846/841(b) are unconstitutionally vague as applied to [Defendant] here warranting vacatur of his convictions.

III.    [Defendant] was deprived of his constitutional right to the effective assistance of counsel based on his attorney's individual and cumulative errors.

IV.     Denial of access to the court/reservation of issues.

(§ 2255 Mot., ECF No. 1833.)

The Government argues that the motion should be denied because the grounds for relief are meritless and/or procedurally defaulted.  The Court agrees that they are meritless.

## II.  Standards

### A.  Merits

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence was in excess of the maximum authorized by law, or that it is otherwise subject to collateral attack.  28 U.S.C. § 2255. To prevail on a § 2255 motion "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict."  *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) (quoting *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)).

### B.  Hearing

The court must hold an evidentiary hearing to determine the issues and make findings of fact and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. . . ."  28 U.S.C. § 2255(b).  No hearing is required if Defendant's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."  *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quotation omitted).

## III. Analysis

***Ground One:*** **Right to an Impartial Jury**

Defendant asserts that he was denied his right to an impartial jury because "there is cause for question as to the impartiality of six of the twelve deliberating jurors." (§ 2255 Mot., PageID.22908.)

The Sixth Amendment guarantees a criminal defendant a trial by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The presence of even a single biased juror deprives a defendant of his right to an impartial jury. *See Morgan*, 504 U.S. at 729. Bias in this context is "actual bias," or "'bias in fact' --the existence of a state of mind that leads to an inference that the person will not act with impartiality.'" *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997)).

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722. In other words, "a defendant's right to an impartial jury is secured if a juror attests that he can set aside any information he obtained and render a verdict based on the evidence presented in court." *Williams v. Bagley*, 380 F.3d 932, 945 (6th Cir. 2004).

"Because the obligation to empanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have

been accorded ample discretion in determining how best to conduct the voir dire." *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981). However, "[w]hen a trial court is confronted with a biased juror . . . the judge must, either *sua sponte* or upon a motion, dismiss the prospective juror for cause." *Miller v. Webb*, 385 F.3d 666, 675 (6th Cir. 2004) (citing *Frazier v. United States*, 335 U.S. 497, 511 (1948)). Likewise, "[t]he question of whether to seat a biased juror is not a discretionary or strategic decision." *Hughes*, 258 F.3d at 463. "[C]ounsel cannot . . . waive a criminal defendant's basic Sixth Amendment right to trial by an impartial jury." *Id.* "If an impaneled juror was actually biased, the conviction must be set aside." *Id.*

### A. Juror Finkbeiner

Defendant notes that Juror Finkbeiner expressed some thoughts on testimony by law enforcement officers. Defendant's attorney asked the jurors whether they would tend to believe a law enforcement officer called by the government more than a witness called by the defense who was not a law enforcement officer. (Trial Tr. I at 58-59, ECF No. 1232.) Juror Gross said that he "wouldn't say that the other person would not be telling the truth . . . because I feel they tell the truth under . . . oath, but I would definitely agree with the law enforcement official." (*Id.* at 59.) Juror Finkbeiner subsequently stated that she had the "same view." (*Id.*) She would "feel that [the law enforcement officer] would be telling the truth more so." (*Id.*) Juror Ansell chimed in with a similar view; the testimony of law enforcement officers would be weighed more "heav[il]y" because they are "professional and they have experience." (*Id.*)

Juror Bean, however, indicated that he would "listen to the facts. They have to substantiate the facts, either side, so it wouldn't matter what their occupation was." (*Id.* at 60.) At that point, Judge Bell intervened to clarify that:

> The question is everyone, whether they're law enforcement, non-law enforcement, government witness, defense witness, everyone has to be evaluated individually, and their individual evaluation is based upon what they tell you and whether that

mirrors reality, whether or not that's consistent with maybe other testimony you found to be believable. But just because he's a doctor doesn't mean everything he says is Gospel. Just because they're a lawyer doesn't mean everything they say is correct. Just because they're a judge doesn't mean they're always right, okay? Let's take it that far.

So I think the gist of her question is starting out with a witness who has a law enforcement background, would you give that person a head start in credibility before you'd hear anything they say or would you say, Wait a minute, I understand they're a law enforcement officer and I hold them to a high standard, and I'm going to evaluate their testimony based upon whether or not it mirrors reality, whether it describes accurately, and whether or not I would believe them, what they say? Isn't that really what we're talking about here? And just because of the title of sergeant or lieutenant or whatever does not in essence make them -- because we wouldn't need you if just they came and told us everything that happened, would we?

(*Id.* at 60-61.)

Defendant's attorney later asked whether any of the jurors would think "if you were accused of a crime or if a person was accused of a crime, that you would definitely take that witness stand?" (*Id.* at 61.) Juror Finkbeiner responded, "I think so. If I was judged wrongly, I'd want to be up there telling my side of the story." (*Id.*) Defendant's attorney subsequently asked whether "anyone [would] judge Mr. Casillas more harshly if he didn't take the witness stand, especially if his lawyer told him you have a constitutional right not to , and like a good gentleman, he listened to his lawyer?" (*Id.* at 62.) None of the jurors responded in the affirmative to this question.

Defendant focuses on Juror Finkbeiner's statement that she would want to testify if she was accused of a crime, and Defendant notes that he did not testify in his defense at trial. (§ 2255 Mot., PageID.22910.) Defendant characterizes Finkbeiner's statement as "bias against a defendant who did not testify," but no such bias is evident in her response. She simply stated that she, personally, would want to tell "her side of the story" if she was "judged wrongly." (Trial Tr. I at 61.) She did not state that she would hold it against a defendant who did not testify. Indeed,

she did not respond when Defendant's attorney asked the jurors if they would judge Defendant more harshly if he chose not to testify.

Defendant also mentions Finkbeiner's statement that she would feel that a law enforcement officer would be telling the truth "more so" than a witness called by the defense, though Defendant does not expressly argue that this statement was evidence of bias. In any event, construing Defendant's motion generously to make such an argument, he has not shown that he is entitled to relief. A "favorable impression of law enforcement officers does not necessarily amount to bias[.]" *United States v. Umana*, 750 F.3d 320, 342 (4th Cir. 2014) (citing *United States v. LaRouch*, 896 F.2d 815, 830 (4th Cir. 1990)); *see also Soto v. Commonwealth*, 139 S.W.3d 827, 850 (Ky. 2004) (juror's statement that he would give more weight to the testimony of police officer than a lay witness was not evidence of bias or prejudice against the defendant). Unlike the juror in *Hughes*, Juror Finkbeiner never indicated that she could be unfair or impartial.

Moreover, Judge Bell addressed this issue by telling the jury that they needed to evaluate each witness' testimony "individually" and that the fact that someone is a law enforcement officer does not necessarily mean that they are telling the truth, because otherwise a jury would not be necessary. (*See* Trial Tr. I at 60-61.)

Finally, this case did not require the jurors to weigh the testimony of a law enforcement officer against that of a witness called by the defense. The defense did not call any witnesses. Moreover, almost all of the testimony supporting Defendant's guilt came from lay people, not law enforcement officers. Thus, the question by Defendant's attorney and the response by Juror Finkbeiner were not really relevant to this case.

Accordingly, for all the foregoing reasons, Defendant has not established the Finkbeiner was actually biased against him.

### B. Juror Dewaha

During voir dire, Juror Dewaha asked the Court, "When you're trying two people at the same time, how – as a juror, how are we going to make the separation of the two gentlemen?" (Trial Tr. I at 64.) The Court explained to her that "some of the testimony that is introduced may cover both of them," and some of the testimony "may cover just one of them," but "each one is required to be given individual consideration in this matter totally apart from one another." (*Id.* at 64-65.) In addition, "the guilt by association sitting over on the same side of the courtroom is not the issue in this case." (*Id.* at 65.)

Defendant asserts that Dewaha "did not say that he could decide the case without finding guilt by association or otherwise express that he believed he could give each defendant separate consideration." (§ 2255 Mot., PageID.22908.) That is true, but it is Defendant's burden to demonstrate that Dewaha was biased. He has not done so. Juror Dewaha asked a simple question about how to decide individual guilt when there were two defendants, and Judge Bell answered that question. In addition, before the jurors deliberated, Judge Bell instructed them that it was their duty "to separately consider the evidence against each defendant on each charge and to return a separate verdict for each of them. . . . Your decision on one defendant or one charge, whether it be guilty or not guilty, therefore should not influence your decision on another defendant or on the other charges." (Trial Tr. IX at 134, ECF No. 1274.) Jurors are "presumed to follow [the Court's] instructions," and "to understand a judge's answer to [their] question[s]." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). There is no indication that Juror Dewaha could not do so.

### C. Juror Jensen

Juror Jensen told the Court during voir dire that he works "in the pharmacy field" and sees "a lot of overuse of drugs and stuff like that"; he had "a strong opinion on like the legality of medication and overuse and that kind of stuff and the selling of it[.]" (Trial Tr. I at 74.) Judge

Bell explained to him that this case involved the distribution of marijuana and cocaine "on the street" as opposed to the sale of prescription drugs. (*Id.*) Judge Bell asked him whether he could be "fair and impartial," and Jensen responded, "Probably not. . . . I don't think so, no. . . . I have a strong opinion on that stuff[.]" (*Id.*)

Judge Bell then explained that the issue was not whether Jensen had a strong opinion, but whether he could "fairly, impartially make a [factual] determination as to whether [Defendants] individually and maybe together were involved in any enterprise that involved these substances." (*Id.* at 74-75.) Jensen stated that he could "try to be fair[.]" (*Id.* at 75.) To resolve any lingering doubt about Jensen's partiality, Judge Bell proceeded further, explaining that the issue is not whether certain substances were unlawful, but whether Defendants were involved; he asked whether Jensen could be "fair and impartial on that." (*Id.*) Jensen affirmed that he could. (*Id.*) Judge Bell also asked Jensen whether he could put the burden on the Government to prove the facts beyond a reasonable doubt. Jensen stated that he could. (*Id.*) Judge Bell then asked whether Jensen could acquit Defendants if the Government could not meet its burden of proof, and Jensen affirmed that he could. (*Id.*) Finally, Judge Bell asked whether Jensen could be "fair and impartial" as to Defendants' innocence or guilt, and Jensen responded that he could. (*Id.*)

In other words, the Court did exactly what it was required to do in this situation. Jensen initially expressed some doubt about his ability to be fair and impartial, and Judge Bell probed him on this issue. After Judge Bell clarified that Jensen's duty as a juror would be to determine a set of facts unrelated to his personal opinions about drug use, Jensen repeatedly affirmed that he could be fair and impartial. A court is entitled to engage in this sort of questioning and to rely on a juror's attestation that he can be fair and impartial. There is no evidence of impermissible bias here.

Defendant compares Judge Bell's treatment of Juror Jensen to his treatment of prospective juror Jackson, who Judge Bell dismissed after Jackson revealed that he could not be impartial because he had served time for a drug offense as a juvenile. (*Id.* at 72-73.) However, the pertinent question is whether one of the jurors who actually decided Defendant's case was biased. The Court's treatment of a prospective juror who was excused from duty sheds no light on that question. Thus, Defendant has not shown that it was improper to seat Juror Jensen.

### D. Juror Sefton

Defendant notes that Juror Sefton revealed that she was the victim of an assault and went to court and testified about the matter. (*Id.* at 77.) Judge Bell asked her whether she could "sit and evaluate a particular set of circumstances . . . in a deliberative and logical fashion irrespective of . . . where we came from and what our experiences have been," and she responded, "Absolutely." (*Id.* at 78.) He also asked her whether she could "set aside that situation that occurred presumably many years ago?" (*Id.*) Again, she responded, "Absolutely." (*Id.*) Finally, the Court asked her whether she could be "fair and impartial" and she affirmed that she could. (*Id.*)

Defendant contends that the Court should have discussed with Sefton the fact the case involved an assault, and should have asked her questions about whether that would negatively impact her. (§ 2255 Mot., PageID.22909.) It was not necessary for the Court to do so, however. She had already indicated that she could set aside her past experience. There is no reason to believe that her response would have been different if she had known that Defendant's case involved an assault.

### E. Juror Theisen

Juror Theisen told the Court during voir dire that she had been running her store in Traverse City, Michigan, because her manager had recently quit. (Trial Tr. I at 76.) Judge Bell

asked if her employees could run the store in his absence, and Theisen responded, "I hope so." (*Id.* at 77.)

Theisen's comments do not indicate any bias on her part. Defendant suggests that she might have been motivated to "rush to judgment," but this is pure speculation on his part. Moreover, such a motivation could lead to any number of different results. It does not necessarily mean that she was biased against Defendant's interests or was motivated to find him guilty. In short, Defendant has not demonstrated that she was actually biased.

### F. Juror Warner

Juror Warner told the Court that he had served as a witness in two trials, one involving embezzlement and one involving the murder of a loved one. (*Id.* at 87.) Judge Bell asked him if the result of the murder case would affect his "ability to fairly, impartially sit on this case and make a decision in this case?" (*Id.* at 88.) He responded, "I think as long as it didn't have anything to do with a murder, I think that I would be impartial." (*Id.*) Judge Bell asked if he could be fair and impartial "as it related to the government proceeding with its proofs and with relation to the defendant in defending the proofs that they have to defend?" (*Id.* at 88-89.) He told the Court, "I think I'd be impartial to it." (*Id.* at 89.)

Defendant's attorney followed up with her own questions, informing Warner that the case involved allegations of assaults that rose to the level of "attempted murder" and asking whether "that [would] change any of [Warner's] answers to the questions?" (*Id.*) Warner stated, "I would like to think I would be impartial, but I really don't know." (*Id.*) He indicated that he could sit through the case, but stated, "Whether I would stay completely impartial without knowing the facts of the case, I don't know. I would like to think I would be able to." (*Id.* at 90.)

If Warner was accepted, there would be a full jury. Judge Bell asked counsel to approach the bench. After a sidebar, Judge Bell stated, "I believe challenge for cause from the

defense?" (*Id.*) Defendant's attorney stated that there were no challenges for cause. Judge Bell then asked if there were any peremptory challenges, and Defendant's attorney stated that there were none. (*Id.*)

As to Juror Warner, Defendant's claim that he was denied an impartial jury falls short because Warner never expressed that she would actually be biased against Defendant. At most, she expressed doubts about her ability to be impartial, but the Sixth Circuit has been clear that "[a] juror's express doubt as to her own impartiality on *voir dire* does not necessarily entail a finding of actual bias. The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on *voir dire*." *Hughes*, 258 F.3d at 458. Juror Warner repeatedly qualified her ability to be impartial with "I think," but "venire members commonly couch their responses to questions concerning bias in terms of 'I think.' Therefore, the use of such language cannot necessarily be construed as equivocation." *Miller v. Francis*, 269 F.3d 609, 618 (6th Cir. 2001).

Moreover, Juror Warner's doubts about her ability to be impartial were premised on the possibility that the case involved murder. The case against Defendant did not involve a murder (though some testimony indicated that other members of the Latin Kings outside Holland had committed murder); it involved aggravated assaults. The Government presented evidence that Defendant and Rios attacked different individuals on behalf of the HLK, not that they murdered people.

Furthermore, the jury acquitted Rios of assault with intent to commit murder. (*See* Verdict, ECF No. 1197, PageID.13777.) That result does not does not make sense if Juror Warner was biased in cases like Defendant's. Thus, Defendant has not shown that Warner was actually biased against him.

Defendant suggests that Judge Bell "invited" an objection to Juror Warner for cause, but it appears that Judge Bell was simply asking for objections to any of the jurors for cause. Judge Bell indicated earlier in the proceedings that the attorneys would first ask the jurors some questions and then they would "proceed with objections they might have." (Trial Tr. I at 54.) Juror Warner was the last juror to be questioned and filled the last remaining seat in the jury box. Thus, it makes sense that, after the attorneys completed their questioning of Warner, Judge Bell would ask whether counsel wished to make any challenges.

In short, Defendant has not demonstrated that any of the jurors was actually biased against him. Defendant compares his case to *White v. United States*, 431 F.3d 517 (6th Cir. 2005), in which a juror "stated repeatedly that she had doubts as to whether she could follow the law" and "did not think it would be fair to the defendant for her to sit on the jury." *Id.* at 541. Most troubling to the court of appeals in *White* was the fact that the juror's statements indicated a "strong inclination toward imposing the death penalty" and that "she was looking forward to participating in the imposition of this particular defendant's sentence." *Id.* No such circumstances are present here. None of the jurors in Defendant's case repeatedly expressed doubts about their ability to follow the law, indicated that it would be unfair for them to sit on the jury, or indicated a strong inclination to reach a particular outcome in Defendant's case. Thus, *White* is inapposite.

For all the foregoing reasons, Ground One is meritless.

**Ground Two: 18 U.S.C. § 1962(d) and 21 U.S.C. §§ 841(b), 846 are unconstitutionally vague as applied to Defendant**

### A. 18 U.S.C. § 1962(d)

Defendant argues that the RICO statute is unconstitutionally vague as applied to him because it permits "any and all personal conduct by someone who is claimed to be affiliated or associated with a particular group of individuals labeled an 'enterprise' . . . to be within the

reach of the . . . statute." (§ 2255 Mot., PageID.22912.)  According to Defendant, the statute was applied "to permit a conviction . . . based on personal physical combat situations labeled as assaults, or drug activity for personal gain." (*Id.*)  In addition, Defendant contends that, at sentencing, the Court "arbitrarily" decided what conduct was "racketeering activity" and "arbitrarily" decided facts that impacted Petitioner's sentence, including the fact that he had an intent to kill an assault victim and the quantity of drugs attributable to the conspiracy. (*Id.*)

The due process protection of the Fifth Amendment prohibits the Government from "taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).

The RICO statute, 18 U.S.C. § 1962, makes it a federal crime to participate in a criminal enterprise through a "pattern of racketeering activity." *Id.*  "Racketeering activity" is defined to include a variety of state and federal offenses, including murder, arson, robbery, bribery, distribution of controlled substances, and others.  18 U.S.C. § 1961(1).  An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]"  18 U.S.C. § 1961(4).

The RICO statute "has survived various void-for-vagueness challenges." *United States v. Morelli*, 643 F.2d 402, 412 (6th Cir. 1981) (collecting cases).  For instance, the court of appeals has held that the term "racketeering activity" is not unconstitutionally vague because the specific crimes incorporated in that term are not unconstitutionally vague. *See Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) ("[T]here is a clear standard of conduct initially proscribed by the pattern requirement of RICO. . . . to avoid any possibility of falling under RICO's admittedly broad umbrella, one need only avoid committing an enumerated crime twice

within ten years."). Here, the jury found that Defendant's racketeering activity involved the distribution of at least five kilograms of cocaine, which is a federal offense. In addition, the Government presented testimony that Defendant assaulted Luis Olivares to further the drug enterprise. An assault, or aggravated assault as alleged by the Government, is also clearly illegal.

Defendant suggests that his drug activity involved "personal gain," but even so his conduct would have been illegal, and if it was part of a pattern of other criminal conduct within a criminal enterprise then it was clearly within the reach of the RICO statute.

The only authority cited by Defendant in support of his vagueness challenge is *Johnson*, in which the Supreme Court determined that a particular clause in the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), is unconstitutionally vague because "it leaves grave uncertainty about how to estimate the risk posed by a crime," and because it "leaves grave uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Johnson*, 135 S. Ct. at 2558. In *Johnson*, the Supreme Court acknowledged that it had repeatedly attempted and failed to "craft a principled and objective standard" out of the relevant provision in the ACCA. *Id.*

Obviously, *Johnson* does not directly apply to Defendant's case because *Johnson* does not address the RICO statute. Moreover, it does not apply by analogy or logic because Defendant has not, and cannot, find the same type of flaws in the RICO statute that the Supreme Court found in the ACCA. To assess the risk of violating the RICO statute, one need only assess the risk of repeatedly violating certain clearly enumerated state and federal laws. Thus, the void-for-vagueness challenge to the RICO statute is meritless.

To the extent Defendant challenges the Court's assessment of facts to determine his sentence, Defendant's claim is equally meritless. In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court reiterated the holding of previous cases that "[a]ny fact (other than a prior

conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by . . . a jury verdict must be admitted by the defendant or proven to the jury beyond a reasonable doubt." *Id.* at 244. That holding meant that judicial fact-finding when sentencing a defendant under the mandatory Sentencing Guidelines violated the Sixth Amendment. As a remedy, the Court made the Sentencing Guidelines "advisory" rather than mandatory. *Id.* at 245. The Court "never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." *Id.* at 233. Defendant Casillas was sentenced when the Sentencing Guidelines were advisory, rather than mandatory, so the concern addressed in *Booker* is not at issue.

Defendant contends that the Court arbitrarily decided that he intended to kill the victim of the assault and arbitrarily decided the quantity of drugs for which he is responsible when determining an appropriate sentence under the Sentencing Guidelines. Regarding Defendant's intent to kill, witnesses testified that Defendant and another individual beat Luis Olivares until he was nearly unconscious, inflicting blunt force injures to Olivares' face, head, spine, and chest, resulting in bone fractures in his face and ribs. (Trial Tr. IV at 878-79, ECF No. 1235.) Defendant kicked Olivares several times when Olivares was on the ground, gargling on his own blood. (*Id.* at 911.) While doing so, Defendant apparently told Olivares, "Yeah, motherfucker. Die, motherfucker." (*Id.*) It was not arbitrary to find an intent to kill based on Defendant's statements and the nature of the injuries that he inflicted on the victim. (*See* Sentencing Tr. 23-24, ECF No. 1476.)

To the extent Defendant challenges the Court's determination of the quantity of drugs at sentencing, this Court discerns no error. Judge Bell issued a sentence within the statutory limit, so any facts that he determined for purposes of sentencing were subject to a preponderance-

of-the-evidence standard of proof.  *United States v. O'Brien*, 560 U.S. 218, 224 (2010).  Judge

Bell determined that Defendant was responsible for distribution of at least 15 kilograms of cocaine,

using on a detailed and conservative calculation based on testimony by cooperating witnesses.

(*See* Sentencing Tr. 28-30.)  There is nothing arbitrary in that calculation.  Defendant's contention

to the contrary is wholly conclusory.

Finally, *Johnson*, which is the only case that Defendant cites in support of his

overall vagueness argument, simply does not apply to the Sentencing Guidelines.  *See Beckles v.

United States*, 137 S. Ct. 886, 894 (2017) ("Because they merely guide the district courts'

discretion, the Guidelines are not amenable to a vagueness challenge.").  Thus, it does not apply

to the Court's calculation of Defendant's range of sentence under the Guidelines.

## B.  21 U.S.C. §§ 841(b), 846

When challenging the drug statutes for vagueness, Defendant repeats his argument

regarding the Court's allegedly arbitrary determination that he was responsible for at least 15

kilograms of cocaine.  As discussed in the previous section, this determination was made under

the Sentencing Guidelines.  It was not made pursuant to the drug statutes.  For all the reasons

already mentioned, Defendant's contention that the Court arbitrarily determined the drug quantity

is conclusory and meritless.

*Ground Three:* **Cumulative Error**

Defendant asserts that the cumulative errors of his counsel, including the issues that

should have been raised in Grounds One and Two, denied him his right to the effective assistance

of counsel.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a

two-prong test by which to evaluate claims of ineffective assistance of counsel.  Defendant must

prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2)

that counsel's deficient performance prejudiced the defendant resulting in an unreliable or

fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## A. Failure to Strike Jurors

As to the issues in Ground One, Defendant cannot show that ineffective assistance of counsel by failing to strike any of the jurors. "Counsel is also accorded particular deference when conducting *voir dire*. An attorney's actions during *voir dire* are considered to be matters of trial strategy." *Hughes*, 258 F.3d at 457. "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Id.* "'Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel.'" *Id.* at 460 (quoting *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992)).

18

Defendant's attorney contends that she was reluctant to exercise any other peremptory challenge after Juror Warner came forward because, after reviewing notes on all the jurors and their body language and demeanor, the remaining potential jurors "appeared worse than the ones who were already seated[.]"  (Chartier Aff, ECF No. 1845, PageID.22955.)  She also notes that Defendant expressed satisfaction with the jurors who were seated, and that counsel for Rios also agreed not to exercise any remaining peremptory challenges.  All of these facts suggest that her decisions regarding the selection of the jury were reasonable.  In addition, as discussed above in Ground One, Defendant has not shown that any of the jurors were actually biased against him.  Thus, he has not overcome the presumption that counsel's actions were strategic, or shown that counsel was ineffective for failing to strike any of the jurors.

## B.  Vagueness Challenge

Defendant implies that his appellate counsel should have raised the issues in Ground Two at the trial court level or on appeal.  However, Defendant's claim that the statutes under which he was convicted are unconstitutionally vague is meritless.  Likewise, there is no support for his contention that the Court arbitrarily decided his intent to murder and the quantity of drugs for which he is responsible.  It was not unreasonable for his counsel to fail to make meritless objections.

## C.  Failure to Object to Security Personnel for Witness Alexander Vargas

Alexander Vargas is a former member and regional leader of the Latin Kings.  He testified about "the history, organization, symbols, and activities of the nationwide Latin Kings organization, [its] links to local chapters, and the various symbols, methods, and organizational details of the operation, which other witnesses then linked to the Holland Latin Kings."  *Rios*, 830 F.3d at 419.  As Vargas testified, there were two security officers present near him in the courtroom, in addition to the Court's security staff.  Near the beginning of Vargas' testimony, the

prosecutor asked him, "There's two people next to you there. They're usually not there. Do you know why they're there?" (Trial Tr. I at 180.) Vargas responded, "For my safety. I turned my back on the Latin Kings." (*Id.*) Vargas explained that, in exchange for cooperation with the Government, he asked to be placed in a "Witness Security Program." (*Id.* at 208.) He indicated that "the only way [he] can survive now" is to have government officers protecting him. (*Id.* at 180.) Near the end of Vargas' testimony, the prosecutor confirmed with Vargas that, in exchange for Vargas' testimony, Vargas was receiving the protection of the United States Marshal's Service, including the agents in the courtroom. (Trial Tr. II at 21, ECF No. 1233.)

Defendant now claims that his attorney should have objected to the presence of the additional security officers during Vargas' testimony. Petitioner contends that the officers' presence had the effect of bolstering Vargas' testimony and "portraying Defendant and the organization Vargas alleged [as] a criminal enterprise [that was] so dangerous that the single witness who had nothing to offer as to the specific factual matters in the case needed two personal security agents next to him[.]" (§ 2255 Mot., PageID.22915.) Defendant contends that the courtroom "was secure enough for every other witness to testify without any concerns or needs for extra personal security." (*Id.*)

In an affidavit in response to Defendant's motion, Defendant's attorney states that she did not object to the presence of the security officers for Vargas because she did not think it "negatively impacted" Defendant's trial; "there was security throughout the courtroom, and Mr. Vargas' additional security was innocuous." (Chartier Aff., PageID.22956.)

"While a district court retains reasonable discretion to determine which security measures are necessary in a given case, this discretion is necessarily limited by a criminal defendant's constitutional rights to a fair trial and due process of law." *United States v. Wilson*,

634 F. App'x 718, 730 (11th Cir. 2015). "Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986).

In *Holbrook*, the Supreme Court held that the presence of four state troopers in the front row of the spectator section of a courtroom during a criminal trial was not "so inherently prejudicial that [defendant] was thereby denied his constitutional right to a fair trial." *Holbrook*, 475 U.S. at 570. The Court did not believe that the four state troopers tended to "brand" the defendant in the eyes of the jury "'with an unmistakable mark of guilt.'" *Id.* at 571 (quoting *Estelle v. Williams*, 425 U.S. 501 (1976)). They were "unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." *Id.*

Defendant cites *United States v. Tocco*, 200 F.3d 401 (6th Cir. 2000), in which the defendant argued that he was entitled to a mistrial because the first government witness was escorted to the witness stand by two FBI agents. *Id.* at 424. The district court denied the request for a mistrial, but directed that no other witnesses would be escorted to the witness stand. On appeal, the court of appeals found no error in the district court's decision because the FBI agents were in plain clothes and "[t]here we no prosecutorial comments relating to the escort and the need for witness protection." *Id.* In addition, "[t]hough witness endangerment could have possibly been inferred, the district court resolved the issue by disallowing such escorts for the other witnesses." *Id.*

Defendant's case is different from *Holbrook* and *Tocco* in that witness endangerment was not simply a *possible* inference that the jury could draw; the issue was made

21

plain to the jury through Vargas' testimony. On the other hand, the prosecutor had Vargas explain the specific reasons for the security personnel; he did not leave the issue to the jury's imagination. Those reasons were not directly related to Defendant. Vargas made clear that the security officers were present because the Government agreed to provide them in exchange for his cooperation, which included his testimony in a previous case. In other words, they were present because Vargas wanted additional protection, and not necessarily because the Government believed he needed it.

Moreover, Vargas made clear that he feared retribution from the Latin King gang generally. He did not mention Defendant or testify about any of his conduct. Vargas testified that he did not even know Defendant. Indeed, Defendant himself asserts that Vargas' testimony was purely background information and was not relevant to the particular facts of Defendant's case. If Vargas did not have any knowledge about Defendant, then there was little reason for the jury draw negative inferences about Defendant from the presence of the security personnel.

In addition, Defendant's case is *similar* to *Tocco* in that only one witness testified with the presence of additional security personnel. After Vargas, a total of thirteen Latin King members and other co-conspirators testified against Defendant. None of them was accompanied by additional security officers. These facts, along with the fact that there were other Court security officers present for the entire trial, diffused any possible prejudice from the presence of additional security for Vargas. As in *Tocco*, this Court concludes that Defendant was not prejudiced by the presence of additional security personnel for Vargas, or the brief references to that personnel in Vargas' testimony. In other words, Defendant cannot demonstrate that he was denied a fair trial or that there is a reasonable probability that, if his counsel had objected to the security personnel, the outcome of his proceeding would have been different.

Defendant also contends that his attorney should have objected to the entire content of Vargas' testimony, presumably because it was irrelevant or it was more prejudicial than probative. His attorney did file a motion to exclude "background" hearsay evidence and "general testimony about gangs and unrelated acts," without specifically mentioning Vargas and without expressly arguing that his testimony would be irrelevant. (*See* ECF Nos. 828, 829, 831.) The Court denied the motion. (ECF No. 898.) In addition, the court of appeals examined the admissibility of Vargas' testimony on appeal, in response to an argument raised by Co-Defendant Rios. The court of appeals reviewed the issue for "plain error" because Rios did not point to any objections to Vargas' entire testimony in the district court. *Rios*, 830 F.3d at 419-20. The court of appeals determined that Vargas' testimony was relevant and was not unduly prejudicial. *Id.* The testimony was relevant because it "helped prove the Indictment's charge that '[t]he Holland Chapter of the Latin Kings . . . was and is overseen by, has always had connections to, and received directions from, the Chicago Heights, Illinois . . . Latin Kings.'" *Id.* at 420. The testimony was not unduly prejudicial because the "drug-related and violent activities" described by Vargas were "largely similar to the types of acts that were discussed in detail [by other witnesses] involving the Holland Latin Kings." *Id.* Defendant offers no reason to believe that the outcome would have been different if his attorney had raised a related objection to Vargas' testimony in the district court. Thus, Defendant has not established unreasonable performance or prejudice for failing to raise such an objection.

### D. Failure to Object to Prosecutor's Comments

Defendant also contends that his attorney should have objected to the prosecutor's references to the HLK as a "domestic terrorist organization." During the prosecutor's closing argument, he stated that "[a] witness told you that the Latin Kings are a domestic terrorist organization. . . . You've seen that it has reigned terror on the city of Holland for the last 20 years."

(Trial Tr. IX at 1996, ECF No. 1274.) He then described several acts of violence by HLK members and reiterated, "[t]his is a domestic terrorist organization." (*Id.*) Later, when summarizing Vargas' testimony, the prosecutor stated, "He didn't want to call this a gang. He called it a domestic terrorist organization." (*Id.* at 2002.)

Instead of objecting to the prosecutor's statements, Defendant's attorney used the term "terrorist organization" against the Government. When questioning the credibility of a witness who was repeatedly arrested and convicted and then cooperated with the Government, she stated,

> Despite all this, the government put on him as a credible witness. And they'll say, Well, listen, this is what happens when you are investigating a domestic terrorist organization, which quite frankly is an extremely loose use of the term "terrorist" and almost offensive when you look at activities that go on around the country and around the world. But they're going to say, Listen, that is what we have to deal with, but it's not. We know that they can make a stronger case. They do not have to rely on the words of liars.

(*Id.* at 2076.) In other words, she used the term to attack the credibility of the Government's proof and to argue that the Government was exaggerating the facts.

She returned to these themes later in her argument when she pointed out that another Government witness "has gotten less than a three-year sentence for being a regional leader of what the government calls a domestic terrorist organization, and he wants to get home even sooner." (*Id.* at 2081.)

In her affidavit, Defendant's attorney states that she did not object to the phrase "domestic terrorist organization" because such an objection "would have been overruled because it was the phrase used by Mr. Vargas." (Chartier Aff., PageID.22956.) In addition, she believed that the jury "could evaluate what evidence they heard rather than just Mr. Vargas' representation of the organization." (*Id.*)

Defendant's attorney's decision not to object, and her strategy to attempt to use the phrase against the Government, was a reasonable one. Here, the prosecutor was repeating a phrase used by one of the witnesses. A prosecutor is allowed to refer to the evidence and to argue "reasonable inferences" from it. *See Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). Thus, any objection likely would have been futile. Counsel does not act unreasonably by failing to make a futile objection.

### E. Cumulative Effect

"[E]xamining an ineffective assistance of counsel claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'" *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)). Here, Defendant's claim of cumulative error is groundless because there are no constitutional deficiencies to cumulate. Consequently, Ground Three is meritless.

*Ground Four:* **Denial of Access to the Court**

Finally, Defendant contends that he asked the Court to lift a "protective order" on discovery in this case, but the Court denied the motion. (§ 2255 Mot., PageID.22916.) Petitioner asserts that he was seeking discovery of information pertinent to his criminal case (his "discovery file"), to which he should have had access when his case was still pending. (*Id.*, PageID.22917.) Petitioner contends that, without this information, he is being denied access to the court to present issues that may be relevant to his motion under § 2255. Defendant's attorney asserts that Defendant was given access to all relevant discovery before trial. (*See* Chartier Aff., PageID.22957.)

Petitioner filed a motion to "lift" a protective order on discovery several months before filing his motion under § 2255. (*See* ECF No. 1757.) The Court denied the motion because

it was lacking in legal or factual support. (Order, ECF No. 1815.) Apparently, Petitioner now contends that the Court erred in its decision, but the Court discerns no error.

First, the Court is not aware of a protective order prohibiting discovery, so Petitioner's motion is factually unsupported.

Second, as the Court stated in its order, a habeas petitioner like Defendant has "'no right to automatic discovery.'" *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1991) ("A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."). Rule 6(a) of the Rules Governing Section 2255 Proceedings provides that the Court "may, *for good cause*, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a) (emphasis added). To demonstrate good cause, Defendant must provide "'*specific allegations* . . . [that] show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore, entitled to relief . . . .'" *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (emphasis in original).

"'The burden of demonstrating the materiality of the information requested is on the moving party.'" *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Stanford*, 266 F.3d at 460). "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'" *Id.* (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997)). Defendant has not met this burden.

Defendant asserts that he is not seeking discovery under Rules Governing Section 2255 Proceedings, but he does not cite any alternative authority that would permit the Court to lift

a non-existent protective order, or to require a party to produce a "discovery file" from his criminal case.

Insofar as Defendant claims he is being denied a right of access to the courts, that right guarantees him access to the tools (e.g., writing materials, postage stamps) necessary to present his claims in a court, *see Bounds v. Smith*, 480 U.S. 817 (1977); it does not guarantee him the right to have the Court produce records or other evidence that he believes are necessary to evaluate *possible* claims that he might raise but has not yet identified. *See United States v. Modena*, 430 F. App'x 444, 447 (6th Cir. 2011) (holding that denial of a criminal defendant's requests for discovery did not deprive him of access to the courts because he "identified no argument he was unable to raise or any evidence he could not introduce due to the district court's order"). In essence, Defendant is asking the Court to sanction a "fishing expedition," which the Rules do not permit.

Finally, Defendant has not responded to, or otherwise refuted, his attorney's assertion that he was given access to all relevant discovery before trial. Accordingly, Ground Four is meritless.

## <u>Conclusion</u>

For the reasons stated, Defendant's grounds for seeking relief under 28 U.S.C. § 2255 are meritless. Moreover, an evidentiary hearing is not required because the record of the case conclusively shows that Defendant is not entitled to relief. Accordingly, Defendant's motion under § 2255 will be denied.

Under 28 U.S.C. § 2253(c), the Court must determine whether to issue a certificate of appealability. A certificate should issue if the movant has demonstrated "a substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit has disapproved

of issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001).  The district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Under *Slack*, to warrant a grant of the certificate, Defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  529 U.S. at 484.

The Court has carefully considered the issues in this matter and finds that reasonable jurists could not find that this Court's denial of Defendant's claims was debatable or wrong.  Thus, a certificate of appealability will be denied.

An order and judgment will enter consistent with this Opinion.


Dated:   February 28, 2019                    /s/ Janet T. Neff
                                              Janet T. Neff
                                              United States District Judge